AO 106 (Rev. 04/10) Application for a Search Warrant (Modified: WAWD 10-26-18)

~~FILED~~ ~~ENTERED~~
~~LODGED~~ ~~RECEIVED~~

**OCT 22 2019**

AT SEATTLE
CLERK U.S. DISTRICT COURT
WESTERN DISTRICT OF WASHINGTON
BY_____DEPUTY

# UNITED STATES DISTRICT COURT
for the
Western District of Washington

In the Matter of the Search of )
*(Briefly describe the property to be searched* )
*or identify the person by name and address)* )   Case No.   **MJ19 - 502**
3329 86th Street South, Lakewood, Washington, and a maroon )
2007 Chevrolet Suburban, bearing North Dakota license )
308CLD, more fully described in Attachments A1-A2 )

## APPLICATION FOR A SEARCH WARRANT

I, a federal law enforcement officer or an attorney for the government, request a search warrant and state under penalty of perjury that I have reason to believe that on the following person or property *(identify the person or describe the property to be searched and give its location):*
3329 86th Street South, Lakewood, Washington, and a maroon 2007 Chevrolet Suburban, bearing North Dakota license 308CLD, more fully described in Attachments A1-A2, incarpeted herein.

located in the _____Western_____ District of _____Washington_____ , there is now concealed *(identify the person or describe the property to be seized)*:

See Attachment B, incorporated herein by reference.

The basis for the search under Fed. R. Crim. P. 41(c) is *(check one or more)*:

☑ evidence of a crime;

☑ contraband, fruits of crime, or other items illegally possessed;

☑ property designed for use, intended for use, or used in committing a crime;

☐ a person to be arrested or a person who is unlawfully restrained.

The search is related to a violation of:

| Code Section | Offense Description |
|---|---|
| 21 USC §§ 841, 843, 846, 18 USC § 922, 924, 1952, 1956, 1957 | As described in Attachment B. |

The application is based on these facts:

✓ See Affidavit of Ryan J. Hamilton, continued on the attached sheet.

☐ Delayed notice of _____ days (give exact ending date if more than 30 days: _____ is requested under 18 U.S.C. § 3103a, the basis of which is set forth on the attached sheet.

Pursuant to Fed. R. Crim. P. 4.1, this warrant is presented: ☐ by reliable electronic means; or; ☐ telephonically recorded.

_____
*Applicant's signature*

Ryan J. Hamilton, DEA Task Force Officer
*Printed name and title*

⊙ The foregoing affidavit was sworn to before me and signed in my presence, or
○ The above-named agent provided a sworn statement attesting to the truth of the foregoing affidavit by telephone.

Date: Oct 22, 2019

_____
*Judge's signature*

City and state:  Seattle, Washington

Mary Alice Theiler, United States Magistrate Judge
*Printed name and title*

USAO: 2019R00280

**ATTACHMENT A**
**Locations and vehicles to be searched**

This warrant authorizes the government to search the following locations and vehicles for evidence and/or fruits of the commission of the following crimes, as further described in Attachment B hereto:  distribution and possession with intent to distribute controlled substances, in violation of Title 21, United States Code, Section 841(a)(1), and conspiracy to commit these offenses in violation of Title 21, United States Code, Section 846; use of a communications facility in furtherance of a felony drug offense in violation of Title 21, United States Code, Section 843(b); importation of controlled substances, in violation of Title 21, United States Code, Section 952; unlawful possession of a firearm, in violation of Title 18, United States Code, Section 922(g); possession of a firearm in furtherance of a drug trafficking crime, in violation of Title 18, United States Code, Section 924(c); and laundering of monetary instruments in violation of Title 18, United States Code, Sections 1956 and 1957.

With respect to the location to be searched, a single-family residence, the search is to include all rooms within the residence, and the detached garage, and any vehicles found within the curtilage of the residence, whether or not particularly named among the vehicles for which specific search authorization is sought.

## ATTACHMENT A1

Current residence of Anthony Jacques MCKINNEY: **3329 86th Street South, Lakewood, Washington.**

**Property Description:** This is a one-story, single-family residence with a single car detached garage, located on a parcel of land identified by the Pierce County Assessor-Treasurer's Office as Parcel #0320312041, owned by MCKINNEY's mother Deanna Greer. The house is light gray in color with white trim. The front door faces to the south and the numbers "3329" are affixed to the residence to the right of this southern facing door.



Attachment A
Page 2

## ATTACHMENT A2

**Target Vehicle 25 (TV25),** a maroon 2007 Chevrolet Suburban, bearing North Dakota license 308CLD, registered to Anthony Jacques MCKINNEY at 920 Cascade Way Northwest, Fort Rice, North Dakota.


(No Photo Available)

**Attachment B**

List of Items to be Searched for and Seized

This warrant authorizes the government to search for and seize the following items:

Evidence and/or fruits of the commission of the following crimes:  distribution and possession with intent to distribute controlled substances, in violation of Title 21, United States Code, Section 841(a)(1), and conspiracy to commit these offenses in violation of Title 21, United States Code, Section 846; use of a communications facility in furtherance of a felony drug offense in violation of Title 21, United States Code, Section 843(b); importation of controlled substances, in violation of Title 21, United States Code, Section 952; unlawful possession of a firearm, in violation of Title 18, United States Code, Section 922(g); possession of a firearm in furtherance of a drug trafficking crime, in violation of Title 18, United States Code, Section 924(c); and laundering of monetary instruments in violation of Title 18, United States Code, Sections 1956 and 1957, as follows:

1. **Controlled Substances**:  Including but not limited methamphetamine, heroin and cocaine.

2. **Drug Paraphernalia**:  Items used, or to be used, to store, process, package, use, and/or distribute controlled substances, such as plastic bags, cutting agents, scales, measuring equipment, tape, hockey or duffel bags, chemicals or items used to test the purity and/or quality of controlled substances, and similar items.

3. **Drug Transaction Records**:  Documents such as ledgers, receipts, notes, and similar items relating to the acquisition, transportation, and distribution of controlled substances, including such records stored in electronic format.

4. **Customer and Supplier Information**:  Items identifying drug customers and drug suppliers, such as telephone records, personal address books, correspondence, diaries, calendars, notes with phone numbers and names, "pay/owe sheets" with drug amounts and prices, maps or directions, and similar items, including such records stored in electronic format.

5. **Cash and Financial Records**:  Currency and financial records, including bank records, safe deposit box records and keys, credit card records, bills, receipts, tax returns, vehicle documents, and similar items; other records that show income and expenditures, net worth, money transfers, wire transmittals, negotiable instruments, bank drafts, cashier's checks, and similar items, including such records stored in electronic format; and money counters.

**Attachment B**

List of Items to be Searched for and Seized

6.    **Photographs/Surveillance**: Photographs, video tapes, digital cameras, surveillance cameras, and associated hardware/storage devices, and similar items, depicting property occupants, friends and relatives of the property occupants, or suspected buyers or sellers of controlled substances, controlled substances or other contraband, weapons, and assets derived from the distribution of controlled substances, including such records stored in electronic format.

7.    **Weapons**: Firearms, magazines, ammunition, and body armor, and other weapons-related items such as holsters and equipment to clean firearms.

8.    **Codes**: Evidence of codes used in the distribution of controlled substances, including but not limited to passwords, code books, cypher or decryption keys, and similar information.

9.    **Property Records**: Deeds, contracts, escrow documents, mortgage documents, rental documents, and other evidence relating to the purchase, ownership, rental, income, expenses, or control of the premises, and similar records of other property owned or rented.

10.    **Indicia of occupancy**, residency, and/or ownership of assets including, but not limited to, utility and telephone bills, canceled envelopes, rental records or payment receipts, leases, mortgage statements, and other documents.

11.    **Evidence of Storage Unit Rental or Access**: rental and payment records, keys and codes, pamphlets, contracts, contact information, directions, passwords, or other documents relating to storage units.

12.    **Evidence of Personal Property Ownership**: Registration information, ownership documents, or other evidence of ownership of personal property including, but not limited to, vehicles, vessels, boats, airplanes, jet skis, all-terrain vehicles, RVs, and other personal property; evidence of international or domestic travel, hotel/motel stays; and any other evidence of unexplained wealth.

13.    **Individual and business financial books**, records, receipts, notes, ledgers, diaries, journals, and all records relating to income, profit, expenditures, or losses, such as:

      a.    Employment records: paychecks or stubs, lists and accounts of employee payrolls, records of employment tax withholdings and contributions, dividends, stock certificates, and compensation to officers.

      b.    Savings accounts: statements, ledger cards, deposit tickets, register records, wire transfer records, correspondence, and withdrawal slips.

**Attachment B**

List of Items to be Searched for and Seized

      c.    Checking accounts:  statements, canceled checks, deposit tickets, credit/debit documents, wire transfer documents, correspondence, and register records.

      d.    Loan Accounts:  financial statements and loan applications for all loans applied for, notes, loan repayment records, and mortgage loan records.

      e.    Collection accounts:  statements and other records.

      f.    Certificates of deposit:  applications, purchase documents, and statements of accounts.

      g.    Credit card accounts:  credit cards, monthly statements, and receipts of use.

      h.    Receipts and records related to gambling wins and losses, or any other contest winnings.

      i.    Insurance:  policies, statements, bills, and claim-related documents.

      j.    Financial records:  profit and loss statements, financial statements, receipts, balance sheets, accounting work papers, any receipts showing purchases made, both business and personal, receipts showing charitable contributions, and income and expense ledgers.

      14.    All bearer bonds, letters of credit, money drafts, money orders, cashier's checks, travelers checks, Treasury checks, bank checks, passbooks, bank drafts, money wrappers, stored value cards, and other forms of financial remuneration evidencing the obtaining, secreting, transfer, and/or concealment of assets and/or expenditures of money.

      15.    All Western Union and/or Money Gram documents and other documents evidencing domestic or international wire transfers, money orders, official checks, cashier's checks, or other negotiable interests that can be purchased with cash. These documents are to include applications, payment records, money orders, frequent customer cards, etc.

      16.    Negotiable instruments, jewelry, precious metals, financial instruments, and other negotiable instruments.

      17.    Documents reflecting the source, receipt, transfer, control, ownership, and disposition of United States and/or foreign currency.

      18.    Correspondence, papers, records, and any other items showing employment or lack of employment.

      19.    Telephone books, and/or address books, facsimile machines to include the other memory system, any papers reflecting names, addresses, telephone numbers, pager numbers, cellular telephone numbers, facsimile, and/or telex numbers, telephone records

**Attachment B**

List of Items to be Searched for and Seized

and bills relating to co-conspirators, sources of supply, customers, financial institutions, and other individuals or businesses with whom a financial relationship exists. Also, telephone answering devices that record telephone conversations and the tapes therein for messages left for or by co-conspirators for the delivery or purchase of controlled substances or laundering of drug proceeds.

20.    Vehicles, safes and locked storage containers found at the subject premises that are capable of storing the items to be seized set forth in this Attachment, and the contents thereof that are otherwise described in this document.

21.    Tools:  Tools that may be used to open hidden compartments in vehicles, paint, bonding agents, magnets, or other items that may be used to open/close or conceal said compartments.

22.    Cell Phones: Cellular telephones and other communications devices including smartphones (i.e., iPhones, Android phones, Blackberries, and the like) may be seized, and searched for the following items:
   a.    Assigned number and identifying telephone serial number (ESN, MIN, IMSI, or IMEI);
   b.    Stored list of recent received, sent, and missed calls;
   c.    Stored contact information;
   d.    Stored photographs of narcotics, currency, firearms, or other weapons, evidence of suspected criminal activity, and/or the user of the phone or suspected co-conspirators, including any embedded GPS data associated with those photographs;
   e.    Stored photographs of real estate, or other records pertaining to the purchase, sale, lease, or renovation of real property including any embedded GPS data associated with those photographs;
   f.    Stored text messages, as well as any messages in any internet messaging apps, including but not limited to Facebook Messenger, iMessage, Wikr, Telegram, Signal, WhatsApp, and similar messaging applications.

23.    Identification documents, including passports, visas, alien registration cards, any travel documents, immigration documents, driver's licenses, identification cards, and social security cards;

24.    Documents indicating travel in interstate and foreign commerce, to include airline tickets, notes and travel itineraries; airline schedules; gas receipts, bills; charge card receipts; hotel, motel, and car rental statements; correspondence with travel agencies and other travel related businesses; airline, rental car, and hotel frequent flier or user

**Attachment B**

List of Items to be Searched for and Seized

cards and statements; passports and visas; telephone bills; photographs of foreign locations; and papers relating to domestic and international travel;

25.     Stored footage from surveillance systems at the locations to be searched which identifies the person(s) in residence, occupancy, control, or ownership of the premises; suspected buyers or sellers of controlled substances; persons in possession of firearms in furtherance of drug trafficking; and persons suspected of engaging in money laundering activities.

**AFFIDAVIT**

| | |
|---|---|
| STATE OF WASHINGTON | ) |
| | )   ss |
| COUNTY OF KING | ) |

I, Ryan J. Hamilton, Task Force Officer, Drug Enforcement Administration, United States Department of Justice, being first duly sworn on oath, depose and state:

## I.   AFFIANT BACKGROUND AND QUALIFICATIONS

1. I am a duly commissioned Police Investigator for the Lakewood Police Department and a Task Force Officer (TFO) with the Drug Enforcement Administration (DEA). Accordingly, I am an investigative or law enforcement officer within the meaning of Section 2510(7) of Title 18, United States Code, and am empowered by law to conduct investigations of and to make arrests for offenses enumerated in Title 18, United States Code, Section 2516. I have been employed by the Lakewood Police Department since October 2004, most recently in the Narcotics unit. From 2001 to October 2004, I was a sworn deputy of the Pierce County Sheriff's Department working the contract City of Lakewood. My formal training includes an Associates Degree in Applied Science in Law Enforcement from Green River Community College and two additional years at the University of Washington working towards a Bachelor's Degree in Law, Society, and Justice (I left one quarter prior to graduation when I was hired by the Pierce County Sheriff's Department). My coursework included classes in Criminal Procedure and Criminal Law.

2. Upon joining the Pierce County Sheriff's Department, I completed 720 hours of training at the Basic Law Enforcement Academy at the Washington State Criminal Justice Training Center (CJTC), where I was trained in the areas of Criminal Investigations, Narcotics Investigations, Interview Skills, Criminal Law, Criminal Procedures, Court Orders, and Search Warrants. I have also completed the 80-hour CJTC Undercover Operations/Investigations School and an 80-hour CJTC Basic Narcotics Investigator course. I served as a Firearms Instructor from 2004 to 2019 and I am

AFFIDAVIT of Task Force Officer Hamilton - 1

1   currently a Field Training Officer (FTO) with the focus of training and evaluating newly

2   hired police officers.

3       3.      As a police officer, I have investigated numerous felony and misdemeanor

4   drug violations.  Further, I have policed areas with high drug usage and associated

5   crimes.  I have planned, participated in, and supervised the execution of more than 100

6   search warrants authorizing the search of locations associated with narcotic traffickers

7   and their co-conspirators, such as residences, businesses, storage facilities, outbuildings,

8   safety deposit boxes, and vehicles.  Additionally, I have authored affidavits in support of,

9   and supervised the execution of, dozens of tracking warrants, including multiple federal

10  tracking warrant affidavits for vehicles and cellular telephones.  I have testified in grand

11  jury proceedings and written reports in the course of investigations.  These investigations

12  have resulted in numerous state and federal prosecutions of individuals who have

13  possessed, imported, or distributed controlled substances, including marijuana, cocaine,

14  methamphetamine, heroin, and prescription medications, as well as the seizure of those

15  illegal drugs and the proceeds from their sale.

16      4.      During the course of my law enforcement career, I have been involved in

17  investigations of numerous criminal offenses, including the offenses involved in this

18  current investigation.  I have participated in more than 50 criminal investigations of illicit

19  drug trafficking organizations, ranging from street-level dealers to major dealers—

20  including Mexico-based drug trafficking organizations (DTOs).  These investigations

21  have also included the unlawful importation, possession with intent to distribute, and

22  distribution of controlled substances; the related laundering of monetary instruments; the

23  conducting of monetary transactions involving the proceeds of specified unlawful

24  activities; and conspiracies associated with criminal narcotics offenses.  These

25  investigations have included use of the following investigative techniques:  confidential

26  informants; undercover investigators; analysis of pen register, trap and trace, and toll

27  records; physical and electronic surveillances; and wiretaps.

28

AFFIDAVIT of Task Force Officer Hamilton - 2

UNITED STATES ATTORNEY
700 STEWART STREET, SUITE 5220
SEATTLE, WASHINGTON 98101
(206) 553-7970

5.      In addition, I have initiated, planned, and executed many narcotics search warrants that resulted in the arrest of suspects and the seizure of evidence.  I have contacted, interviewed, and arrested numerous subjects for the possession, use, sale, distribution, delivery, and manufacture of illicit narcotics.  I have become educated, trained and experienced with the terms, trends, habits, commonalties, methods, and idiosyncrasies surrounding illicit narcotics possession, use, distribution, manufacture, business and culture.

6.      During the course of this investigation I have had the opportunity to listen to, and review transcripts and line sheets (prepared by linguists) documenting the content of, hundreds of intercepted conversations, and read text messages involving the trafficking of methamphetamine, heroin, and other narcotics.  I know through training and experience, including my experience with this investigation, individuals involved in the distribution of controlled substances and other criminal activity often use coded words and inferences when referring to their illegal activity.  Linguists monitored the intercepted communications referred to in this Affidavit; the linguists also have training and experience in monitoring and documenting intercepted calls and text messages, and in interpreting coded drug-related conversations and vague references to drug trafficking. Additionally, I have used information provided by the confidential sources participating in this investigation, to include what I believe to be an accurate translation of these coded words and phrases.  I have used all of this training, experience, and information to substitute what I believe to be an accurate translation for these coded words and inferences, which are at times included in brackets in this Affidavit.  I also have included summaries of conversations, which are based on my review of the line sheets (and, transcripts, where available) of intercepted communications, and from my own experience and from discussions with other experienced law enforcement officers familiar with this investigation who have reviewed the line sheets.  In this Affidavit, I include pertinent portions of intercepted communications, but have not necessarily included the entire conversations between the parties involved.

UNITED STATES ATTORNEY
700 Stewart Street, Suite 5220
Seattle, Washington 98101
(206) 553-7970

1    7.    When providing summaries of calls, text messages, events, and surveillance

2  observations/operations, all the times listed are approximate.

3    8.    My knowledge of the facts set forth in this Affidavit is a result of my

4  personal participation in the investigation, my conversations with other law enforcement

5  personnel participating in this and related investigations, and my review of relevant

6  documents. I have obtained and read the official reports prepared by various law

7  enforcement officers participating in the instant investigation, and other investigations

8  discussed herein.

9    9.    Because I am submitting this Affidavit to establish probable cause to search

10  the location and vehicle described further below, this Affidavit does not contain every

11  fact known to me or learned during the course of this investigation. Instead, I have set

12  forth only the facts that I believe are essential to establish the necessary foundation for

13  the issuance of such warrants and a fair determination of probable cause.

14    **II.    PURPOSE OF AFFIDAVIT**

15    10.    I am submitting this Affidavit in support of an application to search the

16  following location and vehicle, as further described in Attachments A1 and A2:

17    • Current residence of Anthony Jacques MCKINNEY: **3329 86th Street**

18      **South, Lakewood, Washington**; and

19    • **Target Vehicle 25 (TV25)**: a maroon 2007 Chevrolet Suburban bearing

20      North Dakota 308CLD registered to Anthony Jacques MCKINNEY at 920

21      Cascade Way Northwest, Fort Rice, North Dakota;

22  for evidence, fruits and instrumentalities of the following violations: distribution and

23  possession with intent to distribute controlled substances, in violation of Title 21, United

24  States Code, Section 841(a)(1), and conspiracy to commit these offenses in violation of

25  Title 21, United States Code, Section 846; use of a communications facility in

26  furtherance of a felony drug offense in violation of Title 21, United States Code, Section

27  843(b); importation of controlled substances, in violation of Title 21, United States Code,

28  Section 952; unlawful possession of a firearm, in violation of Title 18, United States

AFFIDAVIT of Task Force Officer Hamilton - 4

1      Code, Section 922(g); possession of a firearm in furtherance of a drug trafficking crime,

2      in violation of Title 18, United States Code, Section 924(c); and laundering of monetary

3      instruments in violation of Title 18, United States Code, Sections 1956 and 1957.

4      Although the application to search the location includes a request to also search any

5      vehicles found within the curtilage of the location (see Attachment A) on the grounds that

6      the items to be searched for in Attachment B can be located and stored inside vehicles, I

7      am also specifically requesting authorization to search the vehicle, as identified in

8      Attachment A2, in the event it is not found within the curtilage of the location identified

9      in Attachment A1.

10                   **III.   SOURCES OF INFORMATION**

11            11.   During the course of this investigation, investigators have received

12      information from two confidential sources, as described below.

13            12.   **Confidential Source 1 ("CS1")** first began providing information and

14      assistance to investigators of the DEA Seattle Field Division ("DEA Seattle") in 2008, at

15      which time CS1 was established as a DEA Seattle Confidential Source.  CS1 was initially

16      arrested for a drug-related offense and chose to provide assistance in exchange for

17      charging considerations.  As a result of CS1's assistance, CS1's charges were not referred

18      to a prosecutor.  At that point, CS1 chose to continue providing information and

19      assistance to DEA Seattle for monetary gain.  CS1 then assisted DEA Seattle with a

20      large-scale DTO investigation.  At the end of that investigation, CS1 chose not to assist in

21      any further investigations.  When CS1's participation ended, and he/she was deactivated

22      as a DEA CS, CS1 was still in good standing.

23            13.   In 2013, CS1 was arrested on a drug-related charge by the King County

24      Sheriff's Office (KCSO).  CS1 then began providing information and assistance to KCSO

25      detectives in exchange for charging considerations and was established as a KCSO

26      Confidential Source.  As before with DEA Seattle, CS1 successfully provided assistance

27      and no charges were referred to a prosecutor.  CS1 then chose to continue working with

28      KCSO detectives for monetary gain.  During this time, CS1 successfully provided

UNITED STATES ATTORNEY
700 STEWART STREET, SUITE 5220
SEATTLE, WASHINGTON 98101
(206) 553-7970

1  information to KCSO detectives during several separate and unrelated drug

2  investigations. The information gathered from CS1 was proven accurate during the

3  course of each investigation.

4    14.    As part of CS1's cooperation with KCSO Detectives, CS1 conducted two

5  controlled purchases from HERNANDEZ in August 2018. Unbeknownst to the KCSO

6  Detectives, CS1 engaged in an unauthorized drug transaction in September 2018 with a

7  separate CS working with DEA Tacoma. Shortly thereafter, the overlap between the

8  local (KCSO) and federal (DEA) investigations into the HERNANDEZ DTO was

9  discovered and a joint investigation began.

10    15.    In October 2018, CS1 was approached by investigators and again agreed to

11  cooperate in exchange for charging and monetary considerations. CS1 then continued to

12  assist investigators by providing information and through his/her participation in four

13  subsequent controlled buys between December 2018 and April 2019, in conjunction with

14  CS2.

15    16.    On June 4, 2019, investigators received information from an agent with the

16  Federal Protective Service (FPS) who provides security and screening at federal

17  buildings. According to the agent, CS1 entered a Social Security Administration building

18  in Burien, Washington; during a routine search of CS1's personal property related to

19  CS1's entry to the building, agents discovered a small amount of methamphetamine and

20  heroin. Prior to the search, CS1 alerted agents that he/she had a knife and pepper spray in

21  his/her belongings, but did not say anything about the drugs. After the drugs were found,

22  CS1 denied knowledge of them, stating that he/she was holding the bag the drugs were

23  found in for a friend and was not aware that there were drugs inside it. CS1 subsequently

24  called me to explain the above. CS1's version of events was consistent with the version

25  of events relayed by the FPS agent. FPS maintained custody of the narcotics, wrote an

26  internal report on the incident, and released CS1. CS1 has not been charged with any

27  new crimes related to this contact with law enforcement. I admonished CS1, again

28  advising CS1 that such conduct was not permitted and could result in him/her being

UNITED STATES ATTORNEY
700 Stewart Street, Suite 5220
Seattle, Washington 98101
(206) 553-7970

1  charged with a criminal offense. I also reminded CS1 that any and all involvement in
2  drug trafficking had to be authorized by the DEA ahead of time.

3    17.    After June 4, 2019, investigators intercepted a series of conversations
4  between CS1 and HERNANDEZ and FLORES-Lopez during which CS1 appeared to
5  have ordered heroin and methamphetamine. Investigators subsequently observed CS1
6  meet with FLORES-Lopez on one occasion after a series of intercepted communications.
7  As a result of this conduct, investigators chose not to actively use CS1 throughout the
8  remainder of this investigation.

9    18.    Despite these issues, during the current investigation, CS1 has displayed a
10 basis of knowledge regarding several drugs, including methamphetamine, heroin and
11 cocaine, as well as the methods of transportation, concealment, packaging and sale of
12 those drugs. CS1 is able to accurately describe how methamphetamine and heroin is
13 packaged and transported, how methamphetamine and heroin are consumed, prices
14 associated with various weights of each drug, and various ways traffickers attempt to
15 secrete their drugs. CS1 has also displayed knowledge regarding how DTOs are
16 structured, how they commonly use runners to facilitate their drug trafficking, and the
17 various ways money is moved within DTOs. CS1's understanding of these various topics
18 is consistent with investigators' knowledge and understanding of these topics based on
19 our training and experience.

20    19.    Moreover, CS1 has specific knowledge regarding the HERNANDEZ DTO
21 because CS1 was previously an active member of the DTO and a trusted associate of
22 HERNANDEZ. CS1 has first-hand knowledge of the structure of the DTO, some of the
23 members of the DTO, and some of their redistributors, as well as the common amounts of
24 drugs moved between members of the DTO. The information provided by CS1 has been
25 consistent with the observations made by investigators during the course of the
26 investigation. At no point in time have CS1's actions or statements resulted in
27 investigators questioning the honesty and/or credibility of CS1.

28

AFFIDAVIT of Task Force Officer Hamilton - 7

20.     To date, CS1 has conducted numerous controlled drug purchases in several separate investigations.  Each controlled purchase with CS1 has yielded an amount of illegal drugs consistent with the amount paid.  CS1 has also assisted by providing intelligence related to other investigations in which CS1 did not personally participate. Much of this information was unknown to law enforcement at the time it was received, but was later corroborated.  In total, CS1 has participated in six controlled purchases involving either methamphetamine or heroin as part of this investigation under the supervision of KCSO detectives and/or DEA Tacoma.  In each instance, CS1 arranged the controlled purchase by communicating with the person CS1 knows as "Nicholas" and "Primo," who was later positively identified by CS1 and investigators as HERNANDEZ, the individual who subsequently supplied the methamphetamine, either directly or indirectly, to CS1 or CS2.

21.     CS1 has one non-felony criminal conviction from 2006 for Reckless Endangerment stemming from a DUI arrest.

22.     **Confidential Source 2 ("CS2")** began providing information and assistance to the DEA in 2012 after a drug-related arrest in 2011 for possession of methamphetamine with intent to distribute.  After initially working in exchange for charging considerations stemming from his/her 2011 arrest, CS2 continued to provide, and is currently providing, information and assistance to the DEA in exchange for monetary compensation and immigration benefits.

23.     Since 2012, CS2 has provided information on a regular basis that has been valuable in multiple drug trafficking investigations.  At the direction of DEA investigators, CS2 has performed controlled drug purchases on numerous occasions and has provided information regarding drug traffickers that has been proven credible and reliable.  The information provided by CS2 during these investigations has been verified through prior and/or current investigations, as well as through other sources of information.  Information provided by CS2 has resulted in the seizure of multiple pounds of heroin and methamphetamine.

UNITED STATES ATTORNEY
700 STEWART STREET, SUITE 5220
SEATTLE, WASHINGTON 98101
(206) 553-7970

24.     CS2 is familiar with several drugs, including methamphetamine, heroin and cocaine, as well as the methods of transportation, concealment, packaging and sale of those drugs. CS2 is able to accurately describe how methamphetamine and heroin are packaged and transported, how methamphetamine and heroin are consumed, prices associated with various weights of each drug, various ways traffickers attempt to secrete their drugs, common slang terms used for drugs, and the various ways money is moved within DTOs.

25.     During the course of the present investigation, CS2 has participated in four controlled purchases of methamphetamine and one controlled purchase of heroin from HERNANDEZ, through his runner FLORES-Lopez, under the supervision of the DEA.

26.     CS2's criminal history includes a drug-related arrest in 2011 and an arrest for Felony Harassment in 2017. As discussed above, the 2011 drug charges were not referred to a prosecutor due to CS2's cooperation with DEA. CS2 also completed a deferred disposition with court-ordered treatment for the 2017 Felony Harassment charge. Therefore, CS2 has no criminal convictions.

## IV.   INVESTIGATION SUMMARY

### A.   Introduction

27.     For more than twelve months, investigators have been investigating a methamphetamine and heroin DTO in Western Washington operated by Daniel HERNANDEZ and his associates, referred to herein as the HERNANDEZ DTO. During the course of the investigation into the HERNANDEZ DTO, investigators identified associates and redistributors of the HERNANDEZ DTO to include Norberto FLORES-Lopez, Fernando BAUTISTA-Sanchez, Faustino ISLAS-Estrada, Anthony Jacques MCKINNEY, Adam Mark BISHOP, Mitchell Eugene VAUGHAN, Ryan Lee ISAKSEN, Manuela Gabriele ZAHN, Karissa Jean MASON, Angela Davina ENCINAS, and Yazmin ALVARADO-Isordia. In addition, investigators identified multiple sources of supply and/or couriers to include, Juan Manuel MORENO-Rocha, Doriam German

AFFIDAVIT of Task Force Officer Hamilton - 9

1  MORENO-Rocha, Adrian Alberto SANCHEZ-Esparza, Omar SALAZAR, Luis

2  GUTIERREZ-Rosales, among others.

3      28.    During the twelve months, investigators have conducted countless hours of

4  surveillance, utilized various investigation methods and tools, made controlled purchases

5  of drugs from the HERNANDEZ DTO, and intercepted thousands of drug related

6  telephone calls and text messages with court authorization.  Investigators have identified

7  more than a dozen people in Western Washington who are supplied with distribution

8  quantities of drugs by the HERNANDEZ DTO.

9      29.    On October, 17, 2019, a Grand Jury sitting in the Western District of

10  Washington returned a single-count Indictment against HERNANDEZ DTO member

11  Anthony MCKINNEY.  MCKINNEY is charged in Count 1 with Conspiracy to

12  Distribute Controlled Substances in violations of Title 21, United State Code, Sections

13  841(a)(1) and 846.

14      30.    That same day, the Grand Jury also returned a related seven-count

15  Indictment against HERNANDEZ DTO members Daniel HERNANDEZ, Norberto

16  FLORES-Lopez, Fernando BAUTISTA-Sanchez, Faustino ISLAS-Estrada, Mitchell

17  Eugene VAUGHAN, Adam Mark BISHOP, Ryan Lee ISAKSEN, Manuela Gabriele

18  ZAHN, Karissa Jean MASON, Angela Davina ENCINAS, Doriam German MORENO-

19  Rocha, Adrian Alberto SANCHEZ-Esparza, and Omar SALAZAR.  All of the defendants

20  are charged in Count 1 with Conspiracy to Distribute Controlled Substances in violation

21  of Title 21, United States Code, Sections 841(a)(1) and 846.  HERNANDEZ and

22  FLORES-Lopez are both charged in Counts 2 through 6 with the Distribution of

23  Controlled Substances in violation of Title 21, United States Code, Sections 841(a)(1),

24  841(B)(1)(A) and 841(b)(1)(C).  And finally, HERNANDEZ, Doriam MORENO-Rocha

25  and SANCHEZ-Esparza are charged in Count 7 with Possession of Controlled

26  Substances with Intent to Distribute, in violation of Title 21, United States Code, Sections

27  841(a)(1) and 841(B)(1)(A).

28      //

AFFIDAVIT of Task Force Officer Hamilton - 10

**B.    Summary of Initial Investigation into the HERNANDEZ DTO**

31.    In August 2018, KCSO detectives received information from CS1 regarding a DTO distributing methamphetamine and heroin in and around Burien, Washington.  CS1 reported that a Hispanic male, known to CS1 as "Nicholas" and "Primo," was responsible for the distribution of methamphetamine and heroin throughout Western Washington.  Through surveillance, controlled purchases from "Primo" and his associates, and other investigative techniques, as further described below, investigators determined that "Primo" was Daniel HERNANDEZ, whom DEA Tacoma investigated and arrested in 2005, as described below.  CS1 told KCSO detectives that HERNANDEZ would use runners to distribute his drugs to his redistributors.  CS1 further advised that HERNANDEZ DTO redistributor MCKINNEY would transport heroin and methamphetamine from the DTO to the areas of Spokane, Washington and North Dakota for further redistribution.

32.    In an attempt to corroborate the information gathered from CS1, KCSO detectives conducted two controlled purchases from HERNANDEZ, using CS1, in August 2018.  CS1 purchased methamphetamine during the first controlled purchase and heroin during the second controlled purchase.  Prior to each buy, CS1 made a phone call to HERNANDEZ on speakerphone and KCSO detectives were able to confirm that the person CS1 was speaking with was a Hispanic male.  CS1 was then given pre-recorded funds and followed to HERNANDEZ's residence, at that time located at 10102 8th Ave South, Apartment L98, in Seattle.  KCSO detectives then observed CS1 enter HERNANDEZ's apartment.  A short time later, CS1 emerged from the apartment and detectives followed him/her to another location where CS1 turned over the purchased drugs to KCSO detectives.  CS1 was kept under constant surveillance to ensure that CS1 did not contact anyone, prior to entering or after leaving, HERNANDEZ's apartment.  The drugs purchased in both controlled purchases later field-tested positive for their respective drugs and were booked into evidence.

UNITED STATES ATTORNEY
700 STEWART STREET, SUITE 5220
SEATTLE, WASHINGTON 98101
(206) 553-7970

33.     During multiple surveillance operations between August and October of 2018, KCSO detectives determined that HERNANDEZ's primary residence, at that time was located at 10102 8th Avenue South, Apartment L98, Seattle, Washington.  They further identified FLORES-Lopez as HERNANDEZ's primary runner and determined that FLORES-Lopez resided at 345 Pacific Avenue North, Apartment MM3, Pacific, Washington.  During this time, KCSO detectives observed several meetings between HERNANDEZ and FLORES-Lopez, and saw them both carrying heavy bags into and out of HERNANDEZ's apartment on different occasions.

34.     After CS1's unauthorized control buy from a DEA CS, DEA Tacoma and KCSO discovered the overlap in their investigations and decided to conduct a joint investigation into the HERNANDEZ DTO and, on October 12, 2018, investigators interviewed CS1.  CS1 described the hierarchy of the DTO, with HERNANDEZ being the head of the DTO.  CS1 stated that HERNANDEZ obtained heroin and methamphetamine from his associates in Mexico, one of whom was known by the moniker "Popeye."  CS1 stated that HERNANDEZ would receive the methamphetamine and heroin hidden inside dog food bags that had been resewn shut in order to look new.  According to CS1, once the drugs were in Western Washington, HERNANDEZ would work with others to redistribute the drugs in Western Washington, Eastern Washington (the Spokane area), and North Dakota.

35.     CS1 was able to help investigators to identify several members of the HERNANDEZ DTO.  CS1 also confirmed that HERNANDEZ's preferred method of trafficking illegal drugs was through the use of runners.  CS1 added that HERNANDEZ was only using one runner at that time, who CS1 identified as FLORES-Lopez.  CS1 was also able to provide investigators with FLORES-Lopez's then-current phone number (which has since been replaced with multiple different phone numbers).

36.     CS1 told investigators that HERNANDEZ was associated with a female and her son, who both redistributed drugs for the HERNANDEZ DTO in Thurston County, Washington.  CS1 identified the son as Brent OCKERMAN and later identified

the mother as Manuela ZAHN.  CS1 initially identified both by name, and later verified
each individually when shown their Washington driver's license photo.  CS1 added that
OCKERMAN was a UFC-type fighter and that his trainer, whom CS1 knew as "Dennis,"
was also a drug-trafficking associate of HERNANDEZ.  Investigators would later
identify that trainer as Dennis HALLMAN.  Investigators had identified HALLMAN's
phone number, subscribed in his name, as a possible associate of the HERNANDEZ
DTO based on the frequency of calls between HALLMAN's phone number and Target
Telephone 2 (TT2), which agents believe HERNANDEZ DTO runner FLORES-Lopez
used during this investigation.  Investigators later showed CS1 a photo of HALLMAN to
see if CS1 would recognize him.  CS1 positively identified HALLMAN as the person
he/she knew as "Dennis."

37.    CS1 also positively identified Anthony Jacques MCKINNEY as the person
CS1 knew as the HERNANDEZ DTO top redistributor who went by the moniker
"Sancho" and transported DTO drugs from Western Washington to the areas of Spokane,
Washington and North Dakota.

38.    Investigators learned of a prior investigation into MCKINNEY's drug
trafficking activities in North Dakota.  In 2013, the Metro Area Narcotics Task Force
(MANTF) of North Dakota conducted an investigation into a DTO working in and
around Bismarck, North Dakota.  During this investigation, Investigators learned from
two Cooperating Defendants, who were members of the DTO, that MCKINNEY was the
leader of the DTO.

39.    On June 17, 2013, MANTF investigators conducted an interview of a
Source of Information 1 (hereinafter "SOI1"), an individual suspected of assisting
MCKINNEY in the distribution of drugs in North Dakota.  SOI1 provided the
information in the hopes of receiving consideration at sentencing.  The interview was
conducted at the Burleigh County Courthouse in the presence of SOI1's attorney.  In
addition to the felony charge of Criminal Conspiracy to Deliver Methamphetamine in
North Dakota stemming from this 2013 MANTF investigation, SOI1's criminal history

UNITED STATES ATTORNEY
700 Stewart Street, Suite 5220
Seattle, Washington 98101
(206) 553-7970

1  from Washington consists of felony convictions for Assault in the Second Degree (2004),

2  Assault in the First Degree (2006), and Unlawful Possession of a Firearm in the First

3  Degree (2006), and a non-felony conviction for Malicious Mischief in the Third Degree

4  (2003).

5      40.    SOI1 admitted being from the State of Washington and meeting

6  MCKINNEY there.  SOI1 stated that MCKINNEY told SOI1 that there was a lot of

7  money to be made moving and selling drugs in North Dakota.  SOI1 admitted to moving

8  to North Dakota and selling methamphetamine, heroin, and ecstasy for MCKINNEY out

9  of various hotels around the Bismarck, North Dakota area.  SOI1 added that

10 MCKINNEY was transporting around nine ounces of methamphetamine every two

11 weeks from Washington to North Dakota.  SOI1 stated that one of MCKINNEY's

12 sources of supply was a Washington resident who went by the moniker "Primo."  In

13 addition, SOI1 stated that members of MCKINNEY's North Dakota DTO sent the drug

14 proceeds back to MCKINNEY via Western Union, direct deposits into his

15 (MCKINNEY's) bank accounts, and by direct cash pickups that MCKINNEY would

16 conduct.  Based on later information received from CS1 as part of the current

17 investigation, including the March 2019 delivery of heroin and methamphetamine by

18 HERNANDEZ to MCKINNEY for the purpose of transporting it to North Dakota to

19 redistribute to others, as well as recent phone toll analysis linking HERNANDEZ and

20 MCKINNEY, investigators believe that the "Primo" referenced by SOI1 in 2013 was

21 likely HERNANDEZ.

22     41.    On July 2, 2013, MANTF investigators conducted an interview of another

23 Source of Information (hereinafter "SOI2), another individual suspected of assisting

24 MCKINNEY in the distribution of drugs in Montana at the office of SOI2's defense

25 lawyer who was present.  SOI2 provided the information in the hopes of receiving

26 consideration at sentencing.  SOI2's only criminal history consists of the felony charge of

27 Criminal Conspiracy to Deliver Methamphetamine stemming from the 2013 MANTF

28 investigation.

AFFIDAVIT of Task Force Officer Hamilton - 14

42.     SOI2 stated that she was recruited to sell drugs by MCKINNEY.  SOI2 said that she moved out to the Bismarck, North Dakota area to become part of MCKINNEY's DTO.  SOI2 stated that MCKINNEY was in charge and that the drugs the DTO sold were transported from the State of Washington via train or car.  SOI2 admitted to transporting an unknown quantity of methamphetamine for MCKINNEY after returning to the State of Washington for a visit.  SOI2 stated that, during her visit to the State of Washington, MCKINNEY picked her up and gave her a large package of methamphetamine, which SOI2 then transported back to North Dakota to be redistributed by the DTO.

43.     Despite all of this information, it does not appear that MCKINNEY was ever arrested or prosecuted for his conduct in Montana.

44.     More recently, on May 18, 2019, Burleigh County Sheriff's Office conducted a traffic stop in North Dakota.  The driver of the vehicle was identified as Misty PAINTE and her passenger was identified as Marshall STAFFORD.  Due to the odor of marijuana, a search of the car was conducted.  During the search, deputies found heroin, methamphetamine, and other drug paraphernalia.  Both occupants were subsequently arrested for possession of these items.

45.     During a post-arrest interview, PAINTE waived her Miranda rights and admitted to being a heroin and methamphetamine redistributor for MCKINNEY. PAINTE was able to provide information pertaining to MCKINNEY such as his phone number (253-260-9508) and that MCKINNEY was from the State of Washington. PAINTE also said she had previously wired money to MCKINNEY.  The information provided by PAINTE was consistent with the interviews of prior MCKINNEY associates conducted by Mandan PD (North Dakota) in 2013.

C.     **Summary of Controlled Buys from the HERNANDEZ DTO**

46.     In December 2018, investigators developed a plan to introduce a second Confidential Source (CS2) to the HERNANDEZ DTO for the purpose of making future controlled drug purchases.  As described below, investigators subsequently conducted

UNITED STATES ATTORNEY
700 STEWART STREET, SUITE 5220
SEATTLE, WASHINGTON 98101
(206) 553-7970

1  five more controlled purchases of methamphetamine and one controlled purchase of

2  heroin from HERNANDEZ and/or FLORES-Lopez.

3      47.    A controlled buy is a purchase of drugs from a drug distributor, where the

4  quantity, price, location, and transactions are "controlled" and/or monitored by law

5  enforcement.  Prior to the controlled purchase, investigators search the CS before he/she

6  contacts the person(s) engaged in selling the controlled substance(s).  If there is a vehicle

7  involved, investigators also will search it to ensure there is no unauthorized currency or

8  controlled substance(s) inside.  After ensuring that the CS does not have any

9  unauthorized currency or controlled substance(s), detectives supply the CS with "buy

10 money," with pre-recorded serial numbers.  Investigators then equip the CS with a

11 recording device (where possible) and send the CS to contact the person(s) distributing

12 the controlled substances.  While en route, during, and after the transaction, investigators

13 make every effort to maintain constant surveillance of the CS, ensuring that only the

14 target subject is contacted, to eliminate the possibility that the controlled substances(s)

15 were obtained from a person different than the target subject.  After the CS makes the

16 purchase, investigators meet with him/her at a pre-arranged location and again search the

17 CS and his/her vehicle to ensure that he/she does not have unauthorized currency or

18 controlled substance(s), other than the controlled substance(s) that he/she was instructed

19 to purchase from the suspected seller.

20     48.    In this investigation, CS1 and/or CS2 made the following controlled

21 purchases of methamphetamine or heroin, most of which were audio- and video-recorded

22 (more details regarding each controlled purchase are provided below):

| DATE | DRUG AMOUNT | CS | PERSONS INVOLVED |
|---|---|---|---|
| December 20, 2018 | 4 oz Meth | CS1 & CS2 | HERNANDEZ & FLORES-Lopez |
| January 16, 2019 | 1 lb Meth | CS1 | HERNANDEZ & ISLAS-Estrada |

AFFIDAVIT of Task Force Officer Hamilton - 16

| February 25, 2019 | 1 lb Meth | CS1 & CS2 | HERNANDEZ & FLORES-Lopez |
| April 16, 2019 | 1 lb Meth | CS1 & CS2 | HERNANDEZ & FLORES-Lopez |
| June 12, 2019 | 1 oz Heroin | CS2 | HERNANDEZ & FLORES-Lopez |
| June 28, 2019 | 4 lb Meth | CS2 | HERNANDEZ & FLORES-Lopez |

49.     On December 20, 2018, under investigators' supervision, CS2 purchased 155.3 grams of 100% pure methamphetamine from FLORES-Lopez for $1,400.00.  CS1 arranged the controlled buy of methamphetamine with HERNANDEZ, who agreed to sell to CS2 via his runner, FLORES-Lopez.  CS2 met FLORES-Lopez in a motel parking lot in Pierce County, Washington.

50.     On January 16, 2019, under investigators' supervision, CS1 purchased 444.6 grams of 100% pure methamphetamine from HERNANDEZ for $3,700.00.  CS1 met HERNANDEZ at the prior residence of ISLAS-Estrada, 25611 27th Place South, Apartment F204, Kent, Washington to obtain the methamphetamine.

51.     On February 25, 2019, under investigators' supervision, CS2 purchased 446.0 grams of 100% pure methamphetamine from FLORES-Lopez for $3,700.00.  CS1 arranged the controlled buy of methamphetamine with HERNANDEZ, who agreed to sell to CS2 via his runner, FLORES-Lopez.  CS2 met FLORES-Lopez in a business parking lot in King County, Washington.

52.     On April 16, 2019, under investigators' supervision, CS2 purchased 444.4 grams of 100% pure methamphetamine from FLORES-Lopez for $3,700.00.  CS1 arranged the controlled buy of methamphetamine with HERNANDEZ, who agreed to sell to CS2 via his runner, FLORES-Lopez.  CS2 met FLORES-Lopez in a business parking lot in King County, Washington.

UNITED STATES ATTORNEY
700 STEWART STREET, SUITE 5220
SEATTLE, WASHINGTON 98101
(206) 553-7970

53.     On June 12, 2019, under investigators' supervision, CS2 purchased 25.7 grams of heroin from FLORES-Lopez for $760.00.  CS2 arranged the controlled buy of heroin with HERNANDEZ, who agreed to sell CS2 up to four ounces of heroin via his runner, FLORES-Lopez.  HERNANDEZ requested that CS2 take just one ounce and test the quality before buying multiple ounces.  CS2 met FLORES-Lopez in a business parking lot in King County, Washington.

54.     On June 28, 2019, under investigators' supervision, CS2 purchased 1,787.0 grams of 100% pure methamphetamine from FLORES-Lopez for $11,600.00.  CS2 arranged the controlled buy of methamphetamine with HERNANDEZ, who agreed to sell CS2 four pounds of methamphetamine via his runner, FLORES-Lopez.  CS2 met with FLORES-Lopez in a business parking lot in King County, Washington.

**D.     Summary of Authorizations to Intercept HERNANDEZ DTO Communications**

55.     On June 3, 2019, United States District Court Judge Ronald B. Leighton (Western District of Washington) signed an Order authorizing the initial interception of wire and electronic communications over Target Telephone 1 (TT1) and Target Telephone 3 (TT3), used by HERNANDEZ, and Target Telephone 2 (TT2), used by FLORES-Lopez.  The interception of TT1, TT2, and TT3 began the same day (June 3, 2019).  The interception of TT1 (HERNANDEZ) and TT2 (FLORES-Lopez) ended on July 2, 2019, after 30 days of interception.  The interception of TT3 (HERNANDEZ), however, ended on June 12, 2019, after no communications had been intercepted.[1]

---

[1] After the order authorizing interception was signed on June 3, 2019, investigators learned that service to TT3 had been discontinued as of May 27, 2019.  Investigators believed TT3 was a prepaid cellular phone and, as a result, elected to begin the interception process in case TT3 was reactivated.  However, by June 12, 2019, no conversations were intercepted; there were seven (7) incoming calls to TT3 between June 5, 2019 and June 11, 2019, but none of them were connected or intercepted due to the line's "dead" status.  Consequently, investigators stopped intercepting communications over TT3 on June 12, 2019, and the Court sealed the communications on June 14, 2019.  However, based on intercepted calls over TT2 and phone tolls for TT3, investigators know that HERNANDEZ broke TT1 on June 19, 2019, and began using TT3 again.  The next day, June 20, 2019, HERNANDEZ received a replacement phone

AFFIDAVIT of Task Force Officer Hamilton - 18

UNITED STATES ATTORNEY
700 STEWART STREET, SUITE 5220
SEATTLE, WASHINGTON 98101
(206) 553-7970

56.     On July 23, 2019, United States District Court Judge Ronald B. Leighton (Western District of Washington) signed an Order authorizing the renewed interception of wire and electronic communications over TT1, used by HERNANDEZ, and TT2, used by FLORES-Lopez, as well as the initial interception of wire and electronic communications over Target Telephone 5 (TT5), used by Faustino ISLAS-Estrada, and Target Telephone 8 (TT8), used by a male initially known only as "FERNANDO" and later identified as Fernando BAUTISTA-Sanchez.  The interception of TT1, TT5 and TT8 began the same day (July 23, 2019) and ended on August 20, 2019, after 28 days of interception

57.     With respect to TT2, when investigators provided Sprint with the Court's Order, they learned that the phone's current status was "pre-paid barred," which Sprint advised meant that the account was suspended until the user of the phone made a payment.  When Sprint asked if investigators wanted to proceed with the execution of the Order, investigators asked Sprint to wait until they could do further investigation.

58.     Later, during an intercepted call (Session 2162) over TT1 between FLORES-Lopez and HERNANDEZ, FLORES-Lopez informed HERNANDEZ that he (FLORES-Lopez) had disconnected "the other phone," which investigators believed was a reference to TT2.  FLORES-Lopez then told HERNANDEZ, "Yeah and I have the other phones active," which investigators believed to be a reference to another of FLORES-Lopez's historically identified phones, Target Telephone 4 (TT4), and a more-newly acquired phone, Target Telephone 12 (TT12).  FLORES-Lopez and HERNANDEZ then proceeded to talk about the DTO redistributors for the HERNANDEZ DTO and the amount of DTO drugs FLORES-Lopez was currently in possession of.

---

and investigators began intercepting calls over TT1 again.  HERNANDEZ, however, has continued to use TT3 intermittently.

AFFIDAVIT of Task Force Officer Hamilton - 19

59.     Investigators also intercepted a call (Session 29) over TT5 between FLORES-Lopez (TT12) and ISLAS-Estrada (TT5), where ISLAS-Estrada asked FLORES-Lopez if TT12 was FLORES-Lopez's new number.  FLORES-Lopez responded, "Yeah man, this is the new number.  The other one that I had expired."

60.     Based on all of the above information investigators learned regarding FLORES-Lopez's phone (TT2), agents never asked Sprint to execute the Order, and thus there were no interceptions of TT2 during this authorized period.

61.     On August 6, 2019, United States District Court Judge Benjamin H. Settle (Western District of Washington) signed an Order authorizing the initial interception of wire and electronic communications over TT12, used by FLORES-Lopez.  The interception of TT12 began the following day (August 7, 2019) and ended on September 5, 2019, after 30 days of interception

62.     On October 1, 2019, United States District Court Judge Ronald B. Leighton (Western District of Washington) signed an Order authorizing the renewed interception of wire and electronic communications over TT1, used by HERNANDEZ, and the initial interception of wire and electronic communications over Target Telephone 14 (TT14), used by FLORES-Lopez, and Target Telephone 15 (TT15), used by Omar SALAZAR. The interceptions of TT1, TT14, and TT15 are ongoing as of the date of this Affidavit.

**V.     PROBABLE CAUSE FOR THE CURRENT RESIDENCE OF ANTHONY JACQUES MCKINNEY, 3329 86TH STREET SOUTH, LAKEWOOD, WASHINGTON; AND TV25, A MAROON 2007 CHEVROLET SUBURBAN BEARING NORTH DAKOTA 308CLD REGISTERED TO ANTHONY JACQUES MCKINNEY AT 920 CASCADE WAY NORTHWEST, FORT RICE, NORTH DAKOTA.**

63.     During the instant investigation into the HERNANDEZ DTO, investigators have identified several locations and vehicles in Western Washington that they believe the HERNANDEZ DTO uses to facilitate its drug-trafficking activities.  The following paragraphs are offered in support of my belief that probable cause exists to believe that the location listed above and more particularly described in Attachment A1, including outbuildings and vehicles located within the curtilage of same, and the vehicle listed

AFFIDAVIT of Task Force Officer Hamilton - 20

1  above and more particularly described in Attachment A2, contain evidence, fruits, and/or
2  instrumentalities of drug trafficking, firearm, and money laundering crimes mentioned
3  above and further described in Attachment B.

4      64.    The intercepted calls, surveillance observations, GPS location data, CS
5  information, and law enforcement activities described herein do not encompass all of the
6  information collected in the instant investigation.  Rather, I have set forth only the facts
7  that I believe are essential to establish the necessary foundation for the issuance of the
8  requested search warrants and a fair determination of probable cause.  The examples
9  below are only a representative sample of the evidence gathered during the entire
10 investigation.

11     65.    Investigators have identified Anthony Jacques MCKINNEY as a
12 redistributor for the HERNANDEZ DTO who transports both heroin and
13 methamphetamine from Western Washington to the area of Spokane, Washington and the
14 area of Mandan, North Dakota, confirming the previous information provided by CS1.

15     66.    On June 14, 2019, investigators intercepted a call (Session 570) where
16 MCKINNEY discussed a falling out with his brother and co-redistributor Jason BEHN
17 and discussed customers that he had been recruiting.  This phone call was in English and
18 transcribed as follows:

19       HERNANDEZ:    Hey. [Background: kids noise]

20       MCKINNEY:    Hello.

21
22       HERNANDEZ:    Hey.

23       MCKINNEY:    Hey.  What's going on, man?

24       HERNANDEZ:    Not much, waiting for your call.

25       MCKINNEY:    [Laughs] [U/I].  I got two (2) things, one (1), um, Jason and I
26                   have, um, my brother and I have had a kind of falling out, so I
27                   gotta, so I gotta let me hang in there, because he did not like
some of the things that was going on, so, I put, um, I put three
28                   (3) on top of what I was getting.

UNITED STATES ATTORNEY
700 STEWART STREET, SUITE 5220
SEATTLE, WASHINGTON 98101
(206) 553-7970

| | | |
|---|---|---|
| HERNANDEZ: | Okay. |
| MCKINNEY: | Trying to make up, trying to make up for everything that, that was coming up, you know. |
| [Voices overlap] | |
| HERNANDEZ: | Yeah. |
| MCKINNEY: | You know, short and everything. |
| [Voices overlap] | |
| HERNANDEZ: | Yeah, and well, push it really bad. |
| [Voices overlap] | |
| MCKINNEY: | Yeah, yeah, yeah, yeah. |
| HERNANDEZ: | Well, say "hey, everything will be okay, and everything will be okay," you know. |
| MCKINNEY: | Yeah, so, did he, did he call you? |
| HERNANDEZ: | What? |
| MCKINNEY: | He called you? |
| HERNANDEZ: | Who? |
| MCKINNEY: | Um, my brother. |
| HERNANDEZ: | No. |
| MCKINNEY: | He didn't.  Okay, because he said; he said, "Well I just called him", and I'm like, "he ain't going to fuck with you if you just call him if you try to go around me, bro."  [U/I] anyway, he left me hanging out here, you know what I'm saying, but, um, he paid for it, but he got me, so I got that right now, um. |
| HERNANDEZ: | Yeah, but nobody called me. |

UNITED STATES ATTORNEY
700 STEWART STREET, SUITE 5220
SEATTLE, WASHINGTON 98101
(206) 553-7970

| | |
|---|---|
| MCKINNEY: | Okay, okay, okay, cool, um, um he said, he said, he said he'll go to somebody else, he can't, but he said he'll go anyway, so, I've been out here on the street like really knocking this shit out little by little knocking it off.  But it is taking too long, so I need to hurry up and get it done.  Good part about that is that I got, mm, three (3), three (3) guys, three (3) people now that are big buyers, plus I have, um, Western Montana one person is supposed to come meet me from Western Montana, and somebody from Idaho, so that's a good mark up, too. And I'm gonna give you, I'm gonna give you basically everything on top of that, so it is [U/I]. |
| HERNANDEZ: | Yeah, yeah. |
| [Voices overlap] | |
| MCKINNEY: | Because, because. |
| [Voices overlap] | |
| HERNANDEZ: | Yeah, it's not like gonna push you, you know, like whatever behind let's go slow with that [U/I] this last go, you know, let's try come complete, you know, because uh… those people really push    me, you know, because that's true, you know, you're a little bit behind, you know. |
| MCKINNEY: | Right, yeah, I already know that's why I'm trying to hurry up [Laughs] that's why I'm trying to hurry up, it's just with, with the move and just getting back on my feet.  This is my first week and half, you know what I'm saying, so everything is smoothing out, you know. |
| HERNANDEZ: | Um, that's good, so let me know when you are ready, or whatever you want to give me that. |
| MCKINNEY: | Yeah, yeah, yeah, yeah, but I don't, I don't want take, um, I don't wanna take enough for him no more, so, it'll just be back down to, back down to the ten (10). |
| HERNANDEZ: | Okay. |
| MCKINNEY: | And I wanna keep it there, I wanna keep it there until I'm buying it, so I don't even want no more, I don't wanna—until |

UNITED STATES ATTORNEY
700 STEWART STREET, SUITE 5220
SEATTLE, WASHINGTON 98101
(206) 553-7970

|   |   |   |
|---|---|---|
| | | I'm buying it with my money, 'cause I'm, I'm going to put everything in it, so instead of just paying for that, and then extra thousand (1000), and then, you know walking my way up, because I, I gotta, I gotta get you, your money, bro, I gotta get that for you. |
| | HERNANDEZ: | Yeah, sure, it's, it's [U/I] be like always, you know. |
| | MCKINNEY: | Okay, mm, [U/I]. |
| | [Voices overlap] | |
| | HERNANDEZ: | When, when did [U/I] your house? |
| | [Voices overlap] | |
| | MCKINNEY: | By August, I'm gonna be out the home by August, shit. [Laughs] [U/I]. |
| | HERNANDEZ: | [U/I] when, when did you get your house? [U/I]. |
| | MCKINNEY: | Um, what's today? Today is like Thursday? |
| | HERNANDEZ: | Yeah, okay, listen can I call you back in one (1) hour because I'm here, my nephew's gone graduated right now. |
| | MCKINNEY: | Oh, yeah, yeah, yeah, yeah, yeah, call me back, call me back. |
| | HERNANDEZ: | Alright, okay, thank you bro. |

67.   Investigators believe that MCKINNEY would obtain drugs from the HERNANDEZ DTO and then deliver a portion of them to his brother BEHN in Spokane, Washington and that this falling out would affect the amount of drugs MCKINNEY would be picking up from the DTO.  Investigators believe that when MCKINNEY discussed the people in Idaho and Western Montana that MCKINNEY was referring to customers that he had recruited to whom he would sell the DTO's drugs.

68.   Three days later, on June 17, 2019, at 4:13 p.m., investigators intercepted a call (Session 729) between HERNANDEZ (**TT1**) and FLORES-Lopez (TT4).  During

AFFIDAVIT of Task Force Officer Hamilton - 24

the conversation, FLORES-Lopez asked HERNANDEZ if he (FLORES-Lopez) should give "him," who investigators knew was MCKINNEY, "ten," which investigators believed to be a reference to 10 ounces of heroin. HERNANDEZ answered, "Let's see how much money the guy has. Do the math with him please." Investigators believe that HERNANDEZ was instructing FLORES-Lopez to count the money in the presence of MCKINNEY.

69.     Through electronic and physical surveillance, investigators followed FLORES-Lopez to the Motel 6 located at 403 West University Way, Ellensburg, Washington.[2] This was consistent with an intercepted call (Session 409) at 11:49 p.m. from FLORES-Lopez (TT2) to MCKINNEY, where FLORES-Lopez told MCKINNEY "Yeah, alright um, come over here to um, excuse me. Um, over here down to Motel 6."

70.     Just after midnight, on June 18, 2019, investigators observed MCKINNEY arrive to the motel as a passenger in a blue pickup truck. This was consistent with an intercepted call (Session 410) between MCKINNEY and FLORES-Lopez (TT2), where MCKINNEY confirmed he had just arrived in a truck. Investigators then witnessed MCKINNEY exit the passenger side of this truck and walk towards the same motel room FLORES-Lopez previously entered. Investigators later witnessed MCKINNEY walking away from the motel room, get into the driver's seat of the truck, and drive away.

71.     At 3:25 a.m., investigators intercepted the start of a text message exchange between MCKINNEY (TT6) and FLORES-Lopez (TT2). During the exchange (Sessions 412 and 414), MCKINNEY texted FLORES-Lopez, "Need your info" and "I need a name." At 10:30 a.m., FLORES-Lopez responded (Session 419), "Norberto.f44@yahoo.com." MCKINNEY responded "Ok." (Session 419). Later that

---

[2] On June 1, 2019, investigators had observed a meeting between FLORES-Lopez and MCKINNEY near the summit at Snoqualmie Pass. In addition, the tracker for FLORES-Lopez's vehicles have placed him in Ellensburg on October 26, 2018, November 8, 2018, November 19, 2018 and January 7, 2019, which believe were other instances where FLORS-Lopez likely met with MCKINNEY for the purpose of supplying him with the DTO's drugs and/or receiving cash drug proceeds from the sale of previous DTO drugs provided to MCKINNEY.

UNITED STATES ATTORNEY
700 STEWART STREET, SUITE 5220
SEATTLE, WASHINGTON 98101
(206) 553-7970

1  night, at 7:04 p.m., FLORES-Lopez (TT2) sent a text message (Session 421) to

2  MCKINNEY that read, "Has anything been sent?" and MCKINNEY responded at 7:39

3  p.m., with a text message (Session 422) that read, "not if you haven't got it. Fuck ima do

4  it myself." Toll analysis showed a call between FLORES-Lopez (TT2) and

5  MCKINNEY's phone at 12:52 a.m., which was not monitored as the wire room was

6  closed at the time. This, in addition to Session 729 above, suggested to investigators that

7  FLORES-Lopez and MCKINNEY had discussed money owed to the DTO and that this

8  phone call was possibly a reference to the same. Investigators believe that MCKINNEY

9  planned to send money to FLORES-Lopez via electronic means (i.e., Western Union,

10  Paypal, Venmo, etc).

11      72.    The following day, on June 19, 2019, at 4:46 p.m., investigators intercepted

12  another text message exchange (Sessions 434-435) between MCKINNEY and FLORES-

13  Lopez (TT2), during which MCKINNEY asked, "You got that last night" and FLORES-

14  Lopez replied "Yea." Investigators believe that FLORES-Lopez was confirming that he

15  had received the payment from MCKINNEY.

16      73.    On July 30, 2019, MCKINNEY was arrested in Oklahoma on firearm-

17  related charges. MCKINNEY is a convicted felon[3] and, as a result, he is prohibited from

18  possessing firearms. HERNANDEZ and FLORES-Lopez discussed MCKINNEY's

19  arrest during intercepted calls and, like they had with the other redistributors, expressed

20  an interest in trying to bail MCKINNEY out so he could continue to work (sell drugs).

21      74.    After being released from custody, MCKINNEY, reached back out to

22  HERNANDEZ on August 17, 2019.[4] During this initial text exchange, MCKINNEY

23

24  _____

25  [3] In 2000, MCKINNEY was convicted of one count of Burglary in the First Degree, two counts
   of Kidnapping in the First Degree and one count of Robbery in the First Degree for his
26  involvement in a home-invasion robbery.

27  [4] MCKINNEY, commonly referred to as "Sancho", likely reached out the day before because on
   August 16, 2019, HERNANDEZ (TT1) sent the following text to FLORES-Lopez: "This is
28  Sancho's new number 253-993-6631."

1  wrote, "I'll be here tomorrow want to talk about north Dakota," to which HERNANDEZ
2  responded, "Ok, me too, I never push you about the $ , but I have my ppl on me right
3  now, I tried to make deal everywhere to tried to cover what's behind." Sessions 6270 and
4  6272. Investigators believe that MCKINNEY wanted to discuss his drug trafficking
5  activities in North Dakota and that HERNANDEZ wanted to discuss MCKINNEY's debt
6  to the DTO due to the pressures HERNANDEZ was facing from his suppliers ("I have
7  ppl on me right now").

8      75.    The following day (August 18, 2019), HERNANDEZ (TT1) was speaking
9  to PUERCO about the water (methamphetamine). Session 6414. During this
10 conversation, HERNANDEZ explained that his buddy (MCKINNEY) used to move
11 about 20 waters per 15 days, but recently he (MCKINNEY) had problems with his
12 woman (Renee MCKINNEY). PUERCO asked what was going to happen to the waters.
13 HERNANDEZ told PUERCO to give him (HERNANDEZ) ten days to see if he
14 (MCKINNEY) could work something out because he (MCKINNEY) had been piloting
15 through several states and apparently he (MCKINNEY) had found someone.

16     76.    Later that same day, FLORES-Lopez sent a text to HERNANDEZ (TT1)
17 informing HERNANDEZ that "Sancho is ready." Session 6436. When HERNANDEZ
18 asked if "Sancho" had any "paper," FLORES-Lopez replied, "Supposedly for 2."
19 Sessions 6448 and 6450. HERNANDEZ and MCKINNEY then exchanged a series of
20 text messages:

21     HERNANDEZ:       Sancho this one is clean (Session 6454 at 4:28 p.m.)
22     HERNANDEZ:       You said you want without touch (Session 6458 at 4:28 p.m.)
23     MCKINNEY:        Yes numbers the same? (Session 6462 at 4:29 p.m.)
24     HERNANDEZ:       875 (Session 6464 at 4:29 p.m.)
25     HERNANDEZ:       You can cut but not go to hard (Session 6466 at 4:30 p.m.)
26     HERNANDEZ:       That can hold 5-6 points for each one and it will be hard to
27                      notice but not put more (Session 6468 at 4:30 p.m.)
28     MCKINNEY:        Ok let's do 5 money complete (Session 6482 at 4:33 p.m.)

| | | |
|---|---|---|
| 1 | HERNANDEZ: | Ok (Session 6488 at 4:33 p.m.) |
| 2 | HERNANDEZ: | Thanks homie sancho, I will never puch up but this time I |
| 3 | | need you hold my back (Session 6494 at 4:33 p.m.) |
| 4 | MCKINNEY: | I got you bro (Session 6518 at 4:36 p.m.) |

77.    HERNANDEZ then reached back out to FLORES-Lopez to explain that MCKINNEY "was able to get enough for 5." Session 6506.  HERNANDEZ also advised FLORES-Lopez that MCKINNEY would be paying $875 for each ounce of heroin and that FLORES-Lopez could take $50 out from the sale of each ounce as his cut ("He will pay you 875 for each, from there take 50 for each").  Session 6509.

78.    Later, after determining that FLORES-Lopez had six ounces left (Sessions 6470 and 6472) and that FLORES-Lopez was delivering one to ZAHN (Session 6476) and another to BAUTISTA-Sanchez (Sessions 6514, 6528 and 6546), HERNANDEZ then advised MCKINNEY that he was only going to receive four ounces initially and they would get him the fifth ounce a little later on.

| | | |
|---|---|---|
| HERNANDEZ: | He going give u 4 now and one more later, that's ok? (Session 6582 at 6:50 p.m.) |
| HERNANDEZ: | He have 4 left but he will be ready in hour and Half (Session 6584 at 6:50 p.m.) |
| MCKINNEY: | Yes (Session 6586 at 6:50 p.m.) |
| HERNANDEZ: | Ok (Session 6588 at 6:50 p.m.) |
| MCKINNEY: | Ok any more caffeine (Session 6592 at 6:51 p.m.) |
| HERNANDEZ: | Ok (Session 6593 at 6:51 p.m.) |
| HERNANDEZ: | E will bring later (Session 6594 at 6:51 p.m.) |
| HERNANDEZ: | I will send 3 (Session 6595 at 6:51 p.m.) |

79.    Investigators believe that HERNANDEZ initially contacted MCKINNEY telling MCKINNEY that he had heroin with little to no cutting agent in it, which is what HERNANDEZ mean by stating it was "clean" and "without touch."  This is further confirmed when HERNANDEZ told MCKINNEY that each ounce of heroin could hold

UNITED STATES ATTORNEY
700 STEWART STREET, SUITE 5220
SEATTLE, WASHINGTON 98101
(206) 553-7970

1   "5-6 points," which investigators know to mean five to six grams of cutting agent per
2   ounce (25 to 28.3 grams).  MCKINNEY then asked for a price.  HERNANDEZ replied
3   "875," which investigators know to mean $875.00 per ounce which is cheaper than the
4   normal $925.00 to $950.00 per ounce the DTO charges other redistributors for heroin.
5   This further supported investigators' belief that MCKINNEY was at one point
6   HERNANDEZ top redistributor.  MCKINNEY then agreed to purchase five ounces, but
7   HERNANDEZ later advised MCKINNEY that, "He have 4 left but he will be ready in
8   hour and Half."  Investigators know that when HERNANDEZ spoke of a third-party
9   male, that he was referring to his runner FLORES-Lopez.  MCKINNEY then asked
10  HERNANDEZ if HERNANDEZ had "any more caffeine" to which HERNANDEZ
11  replied that he (HERNANDEZ) would send three.  Investigators believe that this could be
12  a reference to pure caffeine as a cutting agent, or it could be a reference to
13  methamphetamine, which is also a stimulant.

14          80.     On August 20, 2019, HERNANDEZ told FLORES-Lopez (TT12) that he
15  (HERNANDEZ) just met with "Sancho" (MCKINNEY) and that MCKINNEY was
16  heading to North Dakota in the morning and from there to Oklahoma for his court
17  hearing.  HERNANDEZ then talked to FLORES-Lopez about MCKINNEY wanting to
18  take a little bit of "water to take out there."  HERNANDEZ then told FLORES-Lopez to
19  stop by his (HERNANDEZ's) place to get the material (methamphetamine) for
20  MCKINNEY.  Session 894.

21          81.     Four days later, on August 24, 2019, FLORES-Lopez told HERNANDEZ
22  that MCKINNEY needed two of the brown kind (two ounces of heroin), but that
23  MCKINNEY was still over in Spokane.  FLORES-Lopez added that MCKINNEY had
24  paper (money) ready.  The call ended when HERNANDEZ received a text from
25  MCKINNEY.  Session 1025.

26          82.     Most recently, on October 15, 2019, investigators intercepted
27  communications (Sessions 304, 306) between FLORES-Lopez and DTO redistributor
28  VAUGHAN, who investigators know to be either a relative or close acquaintance of

AFFIDAVIT of Task Force Officer Hamilton - 29

MCKINNEY. During this conversation, investigators learned that HERNANDEZ was with FLORES-Lopez and could be heard in the background during these conversations. FLORES-Lopez, at HERNANDEZ's request based on comments made in the background by HERNANDEZ, asked VAUGHAN to let them (FLORES-Lopez and HERNANDEZ) know when MCKINNEY was back in town. VAUGHAN made a comment about getting MCKINNEY's phone number to FLORES-Lopez. Investigators believe that VAUGHAN passed on to MCKINNEY that FLORES-Lopez and HERNANDEZ were looking to get in contact with him (MCKINNEY). Investigators further believe that MCKINNEY contacted FLORES-Lopez and asked for FLORES-Lopez to forward MCKINNEY's phone number because MCKINNEY was using a new phone and did not have any contact numbers for the DTO. Investigators believe that MCKINNEY obtained FLORES-Lopez's number from VAUGHAN and that VAUGHAN did not have direct contact with HERNANDEZ. Investigators believe that HERNANDEZ used his other phone (TT3) to contact MCKINNEY, as there were no intercepted calls over TT1 between HERNANDEZ and MCKINNEY. Investigators are not currently intercepting TT3.

83. On October 16, 2019, at 1:56 p.m., investigators intercepted a call (Session 8777) between HERNANDEZ (TT1) and FLORES-Lopez (TT12). During this intercepted call, FLORES-Lopez and HERNANDEZ spoke about several DTO redistributors, including VAUGHAN and MCKINNEY. FLORES-Lopez told HERNANDEZ that VAUGHAN had not yet sent the new phone number for MCKINNEY. HERNANDEZ instructed FLORES-Lopez to not pressure VAUGHAN for MCKINNEY's phone number any further. HERNANDEZ told FLORES-Lopez, "If he's coming, if Sancho's here already, he's going to be at his mom's." Investigators know that the moniker "Sancho" is in reference to MCKINNEY. HERNANDEZ then added, "We'll swing through over there." FLORES-Lopez acknowledged. HERNANDEZ then stated, "Yes, well, he is going to arrive there, he doesn't have any

UNITED STATES ATTORNEY
700 Stewart Street, Suite 5220
Seattle, Washington 98101
(206) 553-7970

1 | other place to stay.  Either way he is bringing the truck/SUV, we'll recognize the
2 | truck/SUV right away."[5]

3 | 84.     Later on October 16, 2019, investigators intercepted two text messages
4 | from phone number 253-231-6264 (TT27) to FLORES-Lopez (TT14).  These text
5 | messages were written in English and are as follows:

6 | 253-231-6264 (TT27):     Give my # to Uncle. (Session 346 at 2:15 p.m.)

7 | 253-231-6264 (TT27):     Tone. (Session 347 at 2:15 p.m)

8 | 85.     Investigators knew that HERNANDEZ was frequently referred to as
9 | FLORES-Lopez's uncle.  Investigators further knew that one of MCKINNEY's monikers
10 | was "Mac Tone," which suggested that the user of TT27 was MCKINNEY.  This belief
11 | was reinforced by the earlier intercepted calls where both HERNANDEZ and FLORES-
12 | Lopez expressed a recent desire to get in contact with MCKINNEY.

13 | 86.     Investigators requested toll information for the phone number 253-231-
14 | 6264 (TT27) and learned that the subscriber to this phone was listed as Deanna L. Greer
15 | at **3329 86th Street South, Lakewood, Washington**.  Investigators know Deanna Greer
16 | to be MCKINNEY's mother based on several police reports and know that MCKINNEY
17 | has previously lived at this location with his mother.  In addition, **3329 86th Street South,**
18 | **Lakewood, Washington** is the subscriber address for one of MCKINNEY's prior phones
19 | (253-260-9508), which was subscribed to MCKINNEY.  In addition, **3329 86th Street**
20 | **South, Lakewood, Washington** is the address listed on MCKINNEY's Washington
21 | State Driver's License.  According to the Pierce County Assessor-Treasurer page,
22 | Deanna Greer is the legal owner of **3329 86th Street South, Lakewood, Washington.**

23 | 87.     On October 17, 2019, at 3:23 p.m., investigators obtained authorization to
24 | obtain real-time location data (GPS) for MCKINNEY's phone (TT27), signed by U.S.
25 | Magistrate Judge Theresa Fricke, US District Court for the Western District of
26 | Washington.

27 | _____

28 | [5] Per the linguists, the word used can mean either truck or SUV.

AFFIDAVIT of Task Force Officer Hamilton - 31

UNITED STATES ATTORNEY
700 STEWART STREET, SUITE 5220
SEATTLE, WASHINGTON 98101
(206) 553-7970

1      88.    Investigators started receiving GPS location data for MCKINNEY's phone

2 (TT27) on October 18, 2019 and attempted to establish a pattern of life based on the 15

3 minute phone pings. Investigators observed that the GPS pings for TT27 were very

4 accurate, some of which were as accurate as six-meters. One of these six-meter (18 feet)

5 pings put MCKINNEY's phone (TT27) at his mom's house, **3329 86th Street South,**

6 **Lakewood, Washington**. Investigators responded to this address and found

7 MCKINNEY's vehicle, a 2007 Chevrolet Suburban bearing North Dakota license

8 308CLD (**TV25**), registered to MCKINNEY, parked in front of **3329 86th Street South,**

9 **Lakewood, Washington**. These observations were consistent with the prior intercepted

10 call between HERNANDEZ and FLORES-Lopez where HERNANDEZ stated that

11 MCKINNEY was driving his vehicle back and that MCKINNEY would be staying at his

12 mom's.

13      89.    Investigators checked the GPS pings for MCKINNEY's phone (TT27)

14 from October 18, 2019 to October 20, 2019 to see what locations he might visit. GPS

15 data for TT27 showed that on October 18, 2019, at 11:24 p.m. that MCKINNEY's phone

16 was in the area of VAUGHAN's known apartment in Puyallup, Washington. GPS data

17 showed that TT27 remained in the area of VAUGHAN's apartment before returning to

18 MCKINNEY's mom's house (**3329 86th Street South, Lakewood, Washington**) at

19 12:52 p.m. TT27 remained at this location for over 20 hours supporting the belief that

20 MCKINNEY was now living at his mom's house.

21      90.    Investigators also noted that on October 19, 2019, MCKINNEY's phone

22 (TT27) visited the residence of VAUGHAN's prior known residence (1706 Violet

23 Meadow Street South, Tacoma, Washington) and remained there from late at night on

24 October 19, 2019 until approximately 3:30 a.m. on October 20, 2019, when TT27

25 returned to MCKINNEY's mom's residence at **3329 86th Street South, Lakewood,**

26 **Washington** and remained there until 5:54 p.m. on the same day.

27      91.    On October 21, 2019, investigators set up surveillance on **3329 86th Street**

28 **South, Lakewood, Washington.** At 10:09 a.m., investigators observed MCKINNEY's

UNITED STATES ATTORNEY
700 Stewart Street, Suite 5220
Seattle, Washington 98101
(206) 553-7970

wife, Renee MCKINNEY exit a white Infinity SUV and enter the residence through the primary front, southern facing, door.  An unknown white male driver remained in the driver's seat of this vehicle for a long period of time before exiting and going into MCKINNEY's mom's house.

92.    At 12:27 p.m., investigators observed Anthony MCKINNEY exit the southern-facing primary door and get into the passenger seat of the same white SUV that Renee MCKINNEY and the unknown white male had arrived in.  This same white male operated the vehicle while Anthony MCKINNEY was in the passenger seat.  This vehicle drove away from the residence with Anthony MCKINNEY in the passenger seat and Renee McKinney inside the residence (**3329 86th Street South, Lakewood, Washington**).  Investigators noticed that the GPS pings for TT27, with an accurate ping, showed the phone move away from the residence when MCKINNEY left.  In addition, investigators noticed that the GPS pings moved in the same southern direction that MCKINNEY traveled away from **3329 86th Street South, Lakewood, Washington.**

## VI.    TACTICS USED BY DRUG TRAFFICKERS

93.    Based upon my training, experience, and participation in this and other investigations involving narcotics trafficking, my conversations with other experienced investigators and law enforcement investigators with whom I work, and interviews of individuals who have been involved in the trafficking of methamphetamine, heroin and other narcotics, I have learned and know the following.

94.    Drug trafficking organizations often use "stash houses" to conceal their illegal activities and contraband.  Oftentimes these stash houses belong to friends and family members.  Such stash houses allow drug traffickers to keep their contraband at a hidden location, where they may not live, thereby making it more difficult for law enforcement and/or competitors to identify these locations where drugs and drug proceeds may be hidden.

95.    It is common for drug dealers to hide proceeds of illegal narcotics sales and records of illegal narcotics transactions in secure locations within their residences, stash

UNITED STATES ATTORNEY
700 STEWART STREET, SUITE 5220
SEATTLE, WASHINGTON 98101
(206) 553-7970

1   houses, storage units, garages, outbuildings and/or vehicles on the property for their
2   ready access and to conceal them from law enforcement authorities.

3       96.     It is common to find papers, letters, billings, documents, and other writings,
4   which show ownership, dominion, and control of businesses, residences, and/or vehicles
5   in the residences, stash houses, storage units, garages, outbuildings and/or vehicles of
6   drug traffickers.  Items of personal property that tend to identify the person(s) in
7   residence, occupancy, control, or ownership of the premises also include canceled mail,
8   deeds, leases, rental agreements, photographs, personal telephone books, diaries, utility
9   and telephone bills, statements, identification documents, keys, financial papers, rental
10  receipts and property ownership papers, personal and business telephone and address
11  books and telephone toll records, and other personal papers or identification cards in the
12  names of subjects involved in the criminal activity being investigated.

13      97.     Drug traffickers frequently amass large proceeds from the illegal sale of
14  controlled substances that they attempt to legitimize.  To accomplish this goal, drug
15  traffickers use financial institutions and their attendant services, securities, cashier's
16  checks, safe deposit boxes, money drafts, real estate, shell operations, and business
17  fronts.  Persons involved in drug trafficking and/or money laundering keep papers
18  relating to these activities for future reference, including federal and state tax records,
19  loan records, mortgages, deeds, titles, certificates of ownership, records regarding
20  investments and securities, safe deposit box rental records and keys, and photographs.  I
21  know from my training and experience that often items of value are concealed by persons
22  involved in large-scale drug trafficking inside of safes, lock boxes, and other secure
23  locations within their residences, outbuildings, and vehicles.

24      98.     Drug traffickers very often place assets in names other than their own to
25  avoid detection of these assets by government agencies, and that even though these assets
26  are in other individual or business names, the drug dealers actually own and continue to
27  use these assets and exercise dominion and control over them.

28

AFFIDAVIT of Task Force Officer Hamilton - 34

99.     Drug traffickers often document aspects of their criminal conduct through photographs or videos of themselves, their associates, their property, and their product. Drug traffickers usually maintain these photographs or videos in their possession.

100.     Drug traffickers often maintain large amounts of US currency in order to maintain and finance their ongoing illegal drug trafficking business.  Often, drug traffickers from other countries operating in the United States frequently use wire remitters and bulk cash transfers to transfer currency to co-conspirators living in other countries.

101.     Drug traffickers commonly have in their possession, on their person, and at their residences and/or in their storage units, firearms and other weapons, which are used to protect and secure a drug trafficker's property.

102.     Drug traffickers use mobile electronic devices including cellular telephones and other wireless communication devices to conduct their illegal activities.  For example, traffickers of controlled substances commonly maintain records of addresses, vehicles, or telephone numbers which reflect names, addresses, vehicles, and/or telephone numbers of their suppliers, customers and associates in the trafficking organization. It is common to find drug traffickers keeping such records of said associates in cellular telephones and other electronic devices.  Traffickers often maintain cellular telephones for ready access to their clientele and to maintain their ongoing narcotics business.  Traffickers frequently change their cellular telephone numbers to avoid detection by law enforcement, and it is common for traffickers to use more than one cellular telephone at any one time.

103.     Drug traffickers use cellular telephones to maintain contact with their suppliers, distributors, and customers.  They prefer cellular telephones because, first, they can be purchased without the location and personal information that landlines require.  Second, they can be easily carried to permit the user maximum flexibility in meeting associates, avoiding police surveillance, and traveling to obtain or distribute drugs.  Third, they can be passed between members of a drug conspiracy to allow substitution

UNITED STATES ATTORNEY
700 STEWART STREET, SUITE 5220
SEATTLE, WASHINGTON 98101
(206) 553-7970

1   when one member leaves the area temporarily.  Since cellular phone use became

2   widespread, every drug dealer I have interacted with has used one or more cellular

3   telephones for his or her drug business.  I also know that it is common for drug traffickers

4   to retain in their possession phones that they previously used, but have discontinued

5   actively using, for their drug trafficking business.  Based on my training and experience,

6   the data maintained in a cellular telephone used by a drug dealer is evidence of a crime or

7   crimes.  This includes the following:

8            a.   The assigned number to the cellular telephone (known as the mobile

9   directory number or MDN), and the identifying telephone serial number (Electronic

10   Serial Number, or ESN), (Mobile Identification Number, or MIN), (International Mobile

11   Subscriber Identity, or IMSI), or (International Mobile Equipment Identity, or IMEI) are

12   important evidence because they reveal the service provider, allow us to obtain subscriber

13   information, and uniquely identify the telephone.  This information can be used to obtain

14   toll records, to identify contacts by this telephone with other cellular telephones used by

15   co-conspirators, to identify other telephones used by the same subscriber or purchased as

16   part of a package, and to confirm if the telephone was contacted by a cooperating source.

17            b.   The stored list of recent received calls and sent calls is important evidence.

18   It identifies telephones recently in contact with the telephone user.  This is valuable

19   information in a drug investigation because it will identify telephones used by other

20   members of the organization, such as suppliers, distributors and customers, and it

21   confirms the date and time of contacts.  If the user is under surveillance, it identifies what

22   number he called during or around the time of a drug transaction or surveilled meeting.

23   Even if a contact involves a telephone user not part of the conspiracy, the information is

24   helpful (and thus is evidence) because it leads to friends and associates of the user who

25   can identify the user, help locate the user, and provide information about the user.

26   Identifying a defendant's law-abiding friends is often just as useful as identifying his

27   drug-trafficking associates.

28

c.   Stored text messages are important evidence, similar to stored numbers. Investigators can identify both drug associates, and friends of the user who likely have helpful information about the user, his location, and his activities.

d.   Photographs on a cellular telephone are evidence because they help identify the user, either through his or her own picture, or through pictures of friends, family, and associates that can identify the user.   Pictures also identify associates likely to be members of the drug trafficking organization.   Some drug traffickers photograph groups of associates, sometimes posing with weapons and showing identifiable gang signs. Also, digital photos often have embedded "geocode" information within them.   Geocode information is typically the longitude and latitude where the photo was taken.   Showing where the photo was taken can have evidentiary value.   This location information is helpful because, for example, it can show where coconspirators meet, where they travel, and where assets might be located

e.   Stored address records are important evidence because they show the user's close associates and family members, and they contain names and nicknames connected to phone numbers that can be used to identify suspects.

104.   It is common for drug dealers to possess narcotics, drug paraphernalia, and other items which are associated with the sale and use of controlled substances such as scales, containers, cutting investigators and packaging materials in their residences, stash houses, storage units, garages, outbuildings and/or vehicles on their property.

105.   Narcotics distributors frequently try to conceal their identities by using fraudulent names and identification cards.   Once identities have been created or stolen from other citizens, drug traffickers use those identifications to falsify records such as DOL records and phone records for the purpose of theft of services and to evade detection by law enforcement.

106.   It is a common practice for drug traffickers to maintain records relating to their drug trafficking activities in their residences, stash houses, storage units, garages, outbuildings and/or vehicles.   Because drug traffickers in many instances will "front"

(that is, sell on consignment) controlled substances to their clients, or alternatively, will be "fronted" these items from their suppliers, such record keeping is necessary to keep track of amounts paid and owed, and such records will also be maintained close at hand so as to readily ascertain current balances.  These records include "pay and owe" records to show balances due for drugs sold in the past (pay) and for payments expected (owe) as to the trafficker's suppliers and distributors, telephone and address listings of clients and suppliers, and records of drug proceeds.  These records are commonly kept for an extended period of time.

107.   Narcotics traffickers maintain books, records, receipts, notes, ledgers, airline tickets, money orders, and other papers relating to the transportation and distribution of controlled substances.  These documents whether in physical or electronic form, are maintained where the traffickers have ready access to them.  These documents include travel records, receipts, airline tickets, auto rental agreements, invoices, and other memorandum disclosing acquisition of assets and personal or business expenses.  I also know that such records are frequently maintained in narcotics traffickers' residences, stash houses, storage units, garages, outbuildings and/or vehicles.

//

//

//

AFFIDAVIT of Task Force Officer Hamilton - 38

UNITED STATES ATTORNEY
700 STEWART STREET, SUITE 5220
SEATTLE, WASHINGTON 98101
(206) 553-7970

# VII.   CONCLUSION

108.   I am submitting this Affidavit in support of an application to search one location and one vehicle, more fully described in Attachments A, and A1-A2.  Based on intercepted phone calls, controlled purchases, and other surveillance events described in this Affidavit, I believe the location and vehicle are being used by MCKINNEY, a member of the HERNANDEZ DTO, to further their drug trafficking, firearm, and money laundering crimes mentioned above and that evidence of those crimes, and described more particularly in Attachment B, will be found at the location and in the vehicle.

Respectfully submitted,

RYAN J. HAMILTON
Task Force Officer
Drug Enforcement Administration

Subscribed and sworn to before me this 22 day of October, 2019.

MARY ALICE THEILER
UNITED STATES MAGISTRATE
JUDGE

AFFIDAVIT of Task Force Officer Hamilton - 39